## BALTIMORE AND POTOMAC RAILROAD COM-PANY v. HOPKINS.

ERROR TO THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

No. 1173. Submitted November 26, 1888. — Decided April 1, 1889.

The validity of a statute is drawn in question when the power to enact it is fairly open to denial, and is denied : but not otherwise.

The " validity of a statute of the United States," as the term is used in the act of March 3, 1885, c. 355, § 2, 23 Stat. 443, " regulating appeals from the Supreme Court of the District of Columbia " to this court, refers only to the power of Congress to enact the particular statute drawn in question, and not to a judicial construction of it which does not question that power.

In an action against the Baltimore and Potomac Railroad Company to recover for injuries suffered by an unlawful use of the streets of Washington by the company, the judgment being for less than the jurisdictional amount necessary to sustain a writ of error, this court will not acquire jurisdiction by reason of a charge to the jury which instructs them that certain uses of those streets were warranted by statutes of the United States, and that certain other uses were not authorized by them.

Semble, that that company is not authorized to occupy the public streets of Washington for the purposes of a freight yard as such.

THIS was an action on the case brought by Hopkins in the Supreme Court of the District of Columbia against the Baltimore and Potomac Railroad Company for injuries alleged by him to have resulted from a nuisance maintained by the railroad company on the public street in front of his door, from the 5th day of October, 1880, to the 5th day of October, 1883, the date of the commencement of the suit, consisting in suffering great numbers of freight cars to remain on said street for an unreasonable length of time; in shifting cars back and forth in an unreasonable manner, with engines making disturbing noises and giving out volumes of smoke, cinders, etc., the cars being often filthy and emitting offensive odors, etc.

The freight station of the company was situated in square 386, at the original terminus of the road between Ninth and Tenth streets on Maryland avenue. Hopkins's dwelling-house was in the square opposite on the north side of Maryland avenue between the same lateral streets.

On the trial of the cause the plaintiff gave evidence tending to prove the truth of the allegations in his declaration, and the defendant gave evidence in its own defence, and, among other things, to establish that the authorities of the District of Columbia in 1874 enclosed the tracks of the railroad with a line of stone curbing on each side about six inches higher than the adjacent surface of the streets, and that the tracks were elevated so as to be flush with this curbing; that the point between Ninth and Tenth streets was regarded and treated as the termini of two lines of railroad, one coming from Virginia and the other from Maryland, and that the freight trains habitually stopped there as at the end of the route, to change engines, etc.; and it was claimed on behalf of defendant that it possessed and exercised authority by virtue of grants from the United States to do all that it did do in the premises, the validity of which authority, it is now insisted, was denied by the court.

Among other instructions given by the court, at plaintiff's request, was the following:

" 8. The defendant company, under its charter, had no right to convert Maryland avenue, between 9th and 10th streets, into a freight yard by using the same for loading or unloading its cars, or to encumber said place with cars by leaving them standing there an unreasonable time when not in use, or to use said part of the avenue for making up freight trains or shifting the same, except so far as may be reasonably necessary for the purpose of carefully carrying cars out of said station over the different tracks for the purpose of making up freight trains; and, if the jury shall find from the evidence that the defendant company did use said parts of Maryland avenue between the times named in the declaration for such loading or unloading of cars, or encumbered the same by leaving the cars standing there an unreasonable time when not in use, and used the same for making up and shifting its freight trains, (except in so far as was reasonably necessary in connection with the careful carrying of such cars into the freight station, or the careful carrying of such cars out of the station over the different tracks for the purpose of making up freight trains.)

and shall further find that such acts on the part of the defendant interfered with the comfortable enjoyment by the plaintiff of his dwelling-house, No. 941 Maryland avenue, then the plaintiff is entitled to recover."

And by instruction 7 the jury were told that — .

"The plaintiff is not entitled to recover for any annoyances, discomforts or inconveniences to himself or his family, or for any injury to the use and enjoyment of said dwelling-house, which resulted from such uses of Maryland avenue by the defendant as were reasonably incident to the careful conduct of its through business, and to the maintenance and careful use of its freight depot or station, abutting on the south side of said avenue between said 9th and 10th streets southwest."

And the court gave, on defendant's behalf, these instructions:

"1. The defendant is entitled to make such careful use of the tracks between 9th and 10th streets on Maryland avenue as may be necessary for the lawful use and enjoyment of its freight depot or station opposite the plaintiff's premises and on square 386.

"2. The plaintiff is not entitled to recover anything in this case for noise, smoke, odors, or any other inconveniences suffered by him or his family by reason of the lawful use by the defendant of the freight station or the tracks in the street in front of the plaintiff's property; and the burden of proof is upon the plaintiff to point out to the jury by satisfactory testimony the acts of the defendant which were unlawful and unauthorized, if any such there were.

"3. The plaintiff, under his declaration and upon the evidence, cannot recover anything under or upon the third and fourth counts of his declaration.

"5. If the jury shall find from the evidence that the Board of Public Works or the Commissioners of the District of Columbia erected or caused to be erected a stone curb higher than the surface of the adjacent parts of Maryland avenue on each side of the railroad tracks, in front of the plaintiff's premises, on said Maryland avenue between 9th and 10th streets, and raised the grade of the street between said curb line, then the defendant is not liable to the plaintiff for any inconvenience or obstruction caused by such curb lines.

"6. The Board of Public Works or the Commissioners of the District of Columbia were authorized by law to erect the curb lines along the outside of the tracks of the defendant and to raise the grade between them, and the said board and their successors had and have lawful authority to maintain the same.

"10. The plaintiff, under the declaration in this case and upon the evidence, cannot recover for injury or inconvenience caused by any obstruction or obstructions in or upon Maryland avenue without showing special damage to himself.

"14. The defendant possesses the lawful right in the conduct of its business to place its trains containing cars loaded with cattle, hogs, or other animals, or vegetables, fruit, fertilizers, or other odoriferous freight, on the tracks in front of the plaintiff's premises for such a reasonable time as may be necessary to enable other trains to pass and also to enable the defendant to take cars out of and to put cars into such trains, and before any damages can be assessed in favor of the plaintiff because of the standing of such cars upon the tracks in front of the plaintiff's premises the plaintiff must show, by satisfactory proof, that such cars on such occasion were kept standing on said tracks for an unreasonable length of time and that the plaintiff was thereby specially injured.

"17. The defendant was authorized and empowered to unload railroad iron upon the surface of the streets in front of the plaintiff's premises for the purpose of repairing its tracks in front of the plaintiff's premises on Maryland avenue between 9th and 10th streets.

"19. The defendant possessed the lawful right to use the several tracks on Maryland avenue between 9th and 10th streets for carefully passing and moving thereon its trains, either loaded or empty, north and south; and for any injury or inconvenience unavoidably caused by such passing and moving of trains the defendant is not liable."

But refused to give at defendant's request, among others, the following:

"10. The plaintiff is not entitled to recover anything on account of dust or noises caused by the loading and unloading

of cars on or within the sixty-foot space between the lateral streets enclosed by the Board of Public Works of the District of Columbia.

"11. The space of sixty feet enclosed by the two lines of curb by the Board of Public Works within which are the tracks of the railroad, and between the streets running north and south, were set aside by the proper authorities of the District of Columbia for railroad purposes, and the plaintiff cannot recover under the pleadings in this case for any discomfort to him or his family, or other injury caused by the loading or unloading of cars at that place.

"14. The defendant has the legal right to the unlimited use of the tracks in the vicinity of its freight depot, in front of the plaintiff's premises, for the purposes of its freight depot between 9th and 10th streets, opposite the plaintiff's premises, provided such tracks are carefully and skilfully used by the defendant."

The court also instructed the jury upon its own motion:

"Congress allowed the company to run its road into the District, along certain streets and avenues, to a certain point — that is, to 9th street, where the present station is located. We have supposed that that implied a right to construct a station building and to construct tracks in the street; but if the business of the company increase beyond the capacity of that freight yard to accommodate it, we have thought that that was no reason which would justify the company in occupying the public streets for the purposes of a freight yard, and that they had no right to stow away or store away their cars and freight in the public streets, nor had they the right to occupy the streets in making up trains to despatch north and south; but we thought that their duty was to acquire more property and to enlarge their freight yard for these purposes. If, in point of fact, without authority of law they did occupy the streets for these purposes it was an illegal thing; but if nobody was hurt by it it would simply be a public nuisance, which would be the subject of an indictment and would not give any private person a right of action against the company; but if, in addition to being a public nuisance, it became a grievance to

private persons owning property in that neighborhood by reason of the obstruction of the street, the noise and the disagreeable odors, then it was a private wrong, also, which these parties are entitled to have redressed. . . . I should further caution you against supposing that the plaintiff is entitled to recover for all the inconvenience he may suffer in consequence of the railroad being located there at all. The railroad company has the right to lay its tracks there by authority of law, and everything which is the inevitable result of the legal use of the road are things which the law does not consider grievances, and does not allow damages for. For example, the trains have a right to pass over the street, to stop there at the station, and to go on in each direction. That necessarily gives some inconvenience to everybody. The noise, the smoke and the dust along the street is a disagreeable thing to the whole neighborhood, but inasmuch as the law authorizes that it is not the subject of a private action. It is only the illegal use of the street which will give a person a right of action against the company, and this I have already explained. The inevitable consequences of the road being located there and of trains travelling in a legal way over the road are what the law calls ‘ *damnum absque injuria* ’ — that is, an injury without any wrong or damage. You will confine your consideration entirely to the temporary inconvenience occasioned by the unlawful occupation of the street for the purposes that have been mentioned.”

The jury found for the plaintiff and assessed his damage at one thousand three hundred and twenty-eight dollars, and judgment was entered on the verdict, which was subsequently affirmed in general term.

To reverse this judgment the writ of error was sued out which defendant in error now moves to dismiss.

The following are the statutory provisions relating to the Baltimore and Potomac Railroad which are deemed material.

The first section of the act of Congress of February 5, 1867, 14 Stat. 387, c. 29, is as follows:

“WHEREAS, it is represented to this present Congress that the Baltimore and Potomac Railroad Company, incorporated

by an act of the General Assembly of Maryland, entitled 'An act to incorporate the Baltimore and Potomac Railroad Company,' passed the sixth day of May, eighteen hundred and fifty-three, are desirous, under the powers which they claim to be vested in them by the provisions of the before recited act, to construct a lateral branch from the said Baltimore and Potomac Railroad to the District of Columbia: Therefore,

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Baltimore and Potomac Railroad Company, incorporated by the said act of the General Assembly of Maryland, shall be, and they are hereby, authorized to extend into and within the District of Columbia, a lateral railroad, such as the said company shall construct or cause to be constructed, in a direction towards the said District, in connection with the railroad which they are about to locate and construct from the city of Baltimore to the Potomac river, in pursuance of their said act of incorporation; and the said Baltimore and Potomac Railroad Company are hereby authorized to exercise the same powers, rights and privileges, and shall be subject to the same restrictions in the extension and construction of the said lateral railroad into and within the said District as they may exercise or are subject to, under and by intent of their said charter or act of incorporation, in the extension and construction of any railroad within the State of Maryland; and shall be entitled to the same rights, compensation, benefits and immunities, in the use of the said road, and in regard thereto, as are provided in their said charter, except the right to construct any lateral road or roads within the said District, from the said lateral branch or road hereby authorized; it being expressly understood that the said Baltimore and Potomac Railroad Company shall have power only to construct from the said Baltimore and Potomac Railroad one lateral road within the said District to some point or terminus within the city and county of Washington, to be determined in the manner hereinafter mentioned."

By § 3 it was provided that the company "in passing into the District aforesaid, and constructing the said road within

the same, shall enter the city of Washington at such place, and shall pass along such public street or alley, to such point or terminus within the said city as may be allowed by Congress, upon presentation of survey and map of proposed location of said road: *Provided,* That the level of said road within the said city shall conform to the present graduation of the streets, unless Congress shall authorize a different level."

The twelfth section of the act of the Legislative Assembly of Maryland, referred to in the above-mentioned act of Congress, Laws of Maryland, 1853, pp. 234, 239, reads thus:

"SEC. 12. And be it enacted, That the president and directors of the said company shall be, and they are hereby, invested with all the rights and powers necessary to the construction, working, use and repair of a railroad from some suitable point in or near the city of Baltimore, and thence within one mile of the town of Upper Marlboro, in Prince George's county, and as near to said town, within the limits of said distance, as may be practicable, and by or near the town of Port Tobacco in Charles county, to a point on the Potomac river, to be selected by the president and directors of said company hereby incorporated, not higher up than Liverpool Point, and not lower down than the mouth of St. Mary's river, with such branches at any point of said railroad, not exceeding twenty miles in length, as the said president and directors may determine; the said road when completed not to be more than sixty-six feet wide, except at or near its depots or stations, where the width may be made greater, with as many tracks as the president and directors may deem necessary; and the said president and directors may cause to be made, or may contract with others for making, said railroad or any part of it, and they or their agents, or those with whom they may contract or their agents, may enter upon and use and excavate any lands which may be wanted for the site of said road or the erection of warehouses or other works necessary for the said road or for its construction and repair; and that they may build bridges, fix scales and weights, lay rails, may take and use earth gravel, stone, timber, or other mate-

rials which may be needed for the construction and repair of
the said road or any of its works, and may make and con-
struct all works whatever which may be necessary and expe-
dient in order to the proper completion and maintenance of the
said road; and they may make, or cause to be made, lateral
railways in any direction whatever from the said railroad,
and for the construction, repair and maintenance thereof shall
have all the rights and powers hereby given in order to the
construction and repair of said principal railroad, and may
also own and employ steamboats or other vessels to connect
the said railroad or railroads with other points by water com-
munication: *Provided*, Nothing herein contained shall be con-
strued to authorize the said company to take private property
for their use without compensation agreed upon by the com-
pany and the owners thereof, or awarded by a jury, as herein-
after provided, being first paid or tendered to the party enti-
tled to receive such compensation."

By act of Congress of March 18, 1869, 16 Stat. 1, 2, c. 2, it
was declared that the Baltimore and Potomac Railroad Com-
pany "may enter the city of Washington with their said rail-
road and construct the same within the limits of said city on
and by whichever one of the two routes herein designated the
said company may elect and determine upon;" and by the
act of March 25, 1870, 16 Stat. 78, c. 32, § 2, a modification
of the second of these two routes was authorized. The termi-
nal point in each was described as a point at the intersection
of South C and West Ninth streets.

The company made choice of the second of the projected
routes, commencing on the western shore of the Eastern
Branch, between South L and South M streets, and thence
passing through K Street and Virginia Avenue to the terminal
point on Ninth Street.

By act of June 21, 1870, 16 Stat. 161, c. 142, Congress
enacted "that the Baltimore and Potomac Railroad Company
be, and they are hereby, authorized and empowered to *extend
their lateral branch*, authorized by the act to which this is a
supplement, and by former supplements to said acts, *by the
way of Maryland Avenue, conforming to its grade*, to the via-

.duct over the Potomac River at the city of Washington, known as the Long Bridge, and to extend their tracks over said bridge, and connect with any railroads, constructed or that may hereafter be constructed, in the State of Virginia," the act authorizing the railroad company, to effect these purposes, to take possession of and use the bridge free of cost and maintain the same, etc.    By virtue of the authority granted by this act the railroad extended its "lateral branch" to the Potomac River from Ninth Street south, by way of Maryland Avenue; and it was further authorized by act of March 3, 1871, 16 Stat. 585, c. 137, in making this extension, to change the grade of Maryland Avenue from Twelfth Street to the Long Bridge in the manner specified in that act, under the supervision of the municipal authorities of Washington.

The act of Congress of May 21, 1872, 17 Stat. 140, c. 189, relating to the establishment of a passenger depot of the company at Sixth and B streets, makes mention of no streets or avenues except B Street and Sixth Street and Virginia Avenue.

*Mr. S. S. Henkle* and *Mr. Samuel Maddox* for the motion.

*Mr. Enoch Totten* opposing.

The plaintiff in error, in the trial court, relied on an authority exercised under the United States, derived through several acts of Congress, to occupy and use the portion of the streets in controversy, in the manner and for the purposes claimed, and the defendant in error denied the validity of the asserted authority.    The question made by this motion is this: Has this court jurisdiction to review the judgment of the court below under the provisions of the second section of the act of March 3d, 1885?

The terminus of the railroad being fixed at the junction of Ninth and C streets, the company had a right under its charter to construct stations, and so forth, there; even if it did not possess this right, it claimed and exercised it, and it has the right to be heard on that question in this court, under this act of Congress.

Statutory authority to build and conduct a railroad includes the authority to build turnouts or side tracks, turn-tables, switches, depots, etc., those permanent and irremovable appendages which constitute parts of the complete structure. *Lake Superior &c. Railroad* v. *United States*, 93 U. S. 442, 453–4; *Rock Creek* v. *Strong*, 96 U. S. 271, 276.

The decision of this court in the case of *Dupasseur* v. *Rochereau*, 21 Wall. 130, seems to be decisive of the question of jurisdiction presented here.

That was a writ of error prosecuted under the provisions of § 709 of the Revised Statutes. A judgment had been rendered by the Circuit Court of the United States for Louisiana, on a vendor's privilege and mortgage, declaring it to be the first lien and privilege on the land; and the marshal sold the property clear of all prior liens; and the mortgagee purchased, and paid into court for the benefit of subsequent liens, the surplus of his bid beyond the amount of his own debt. This judgment and sale were set up by way of defence to a suit brought in the state court by another mortgagee, who claimed priority to the first mortgage, and who had not been made a party to the suit in the Circuit Court. The state court held that the plaintiff was not bound by the former judgment on the question of priority, not being a party to the suit. The case was brought to this court by writ of error and a question was made as to jurisdiction. This court sustained the jurisdiction. Mr. Justice Bradley, in delivering the opinion of the court, said in reference to the question of jurisdiction:

"The case would be one in which a title or right is claimed under an *authority exercised* under the United States, and the decision is against the title or right so set up. It would thus be a case arising under the laws of the United States, establishing the Circuit Court and vesting it with jurisdiction; and hence it would be within the judicial power of the United States, as defined by the Constitution; and it is clearly within the chart of appellate power given to this court, over cases arising in and decided by the state courts." Although the court sustained the jurisdiction, it held that the decision of the court below was correct. See also *Embry* v. *Palmer*, 107

U. S. 3; *Day* v. *Gallup,* 2 Wall. 97; *Verden* v. *Coleman,* 1 Black, 472; *Chicago Life Ins. Co.* v. *Needles,* 113 U. S. 574; *Railroad Co.* v. *Maryland,* 21 Wall. 456; *McGuire* v. *Commonwealth,* 3 Wall. 382, 387; *Hall* v. *Jordan,* 15 Wall. 393.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

Appellate jurisdiction was conferred on this court by the 25th section of the Judiciary Act of 1789, over final judgments and decrees in any suit in the highest court of law or equity of a State in which a decision in the suit could be had, in three classes of cases: First, where is drawn in question the validity of a treaty or statute of, or an authority exercised under, the United States, and the decision is against their validity; secondly, where is drawn in question the validity of a statute of, or an authority exercised under, any State, on the ground of their being repugnant to the Constitution, treaties, or laws of the United States, and the decision is in favor of such their validity; thirdly, where is drawn in question the construction of any clause of the Constitution, or of a treaty, or statute of, or commission held under, the United States, and the decision is against the title, right, privilege, or exemption specially set up or claimed by either party, under such clause of the said Constitution, treaty, statute, or commission. 1 Stat. 73, 85, c. 20, § 25.

By the second section of the act of February 5, 1867, 14 Stat. 385, 386, c. 28, this original 25th section was re-enacted with certain changes, and among others the words " or where is drawn in question the construction of any clause of the Constitution, or of a treaty, or statute of, or commission held under the United States, and the decision is against the title, right, privilege, or exemption specially set up or claimed by either party, under such clause of the said Constitution, treaty, statute or commission," were made to read " or where any title, right, privilege, or immunity is claimed under the Constitution, or any treaty or statute of or commission held, or authority exercised under the United States, and the decision is against

the title, right, privilege, or immunity specially set up or claimed by either party under such Constitution, treaty, statute, commission, or authority," and this was carried into § 709 of the Revised Statutes.

The act of Congress entitled "An act regulating appeals from the Supreme Court of the District of Columbia, and the Supreme Courts of the several Territories," approved March 3, 1885, c. 355, provides:

"That no appeal or writ of error shall hereafter be allowed from any judgment, or decree in any suit at law or in equity in the Supreme Court of the District of Columbia, or in the Supreme Court of any of the territories of the United States, unless the matter in dispute, exclusive of costs, shall exceed the sum of five thousand dollars.

"SEC. 2. That the preceding section shall not apply to any case wherein is involved the validity of any patent or copyright, or in which is drawn in question the validity of a treaty or statute of or an authority exercised under the United States; but in all such cases an appeal or writ of error may be brought without regard to the sum or value in dispute."

When the validity of a statute of, or authority exercised under, the United States, is drawn in question in a state court, the decision of the latter must be against its validity in order to justify a review of such decision, but under this act it is sufficient if the validity is drawn in question irrespective of the conclusion reached. So that the inquiry is confined to whether the validity of such a statute or authority is actually controverted.

In *Dupasseur* v. *Rochereau*, 21 Wall. 130, 134, Mr. Justice Bradley, delivering the opinion of the court, says: "Where a State court refuses to give effect to the judgment of a court of the United States rendered upon the point in dispute, and with jurisdiction of the case and the parties, a question is undoubtedly raised which, under the act of 1867, may be brought to this court for revision. The case would be one in which a title or right is claimed under an authority exercised under the United States, and the decision is against the title or right so set up. It would thus be a case arising under the laws of the

United States establishing the Circuit Court, and vesting it with jurisdiction." This is so because a claim of right or title under an authority exercised under the United States was sufficient to give jurisdiction under that act, whereas the act of 1885 does not so provide, but only that *the validity* of the authority must be drawn in question. The distinction is palpable between a denial of the validity of the authority and a denial of a title, right, privilege or immunity claimed under it.

That part of original § 25, and of the act of 1867, as to decisions in favor of the validity of a statute of, or of an authority exercised under, any State, when drawn in question on the ground of their being repugnant to the Constitution, treaties, or laws of the United States, has been frequently passed upon, and the distinction between the construction of a statute, or the extent of an authority, and the validity of a statute, or of an authority, pointed out. Thus in *Commercial Bank of Cincinnati* v. *Buckingham,* 5 How. 317, where a general law had declared all banks liable to pay six per cent interest on their notes, when they had refused payment on demand, and a subsequent act, incorporating the bank in question, provided for the payment of twelve per cent, and the question was whether the bank was liable to pay eighteen, this court held that the question submitted to and decided by the state court was one of construction and not of validity. There both the prior and subsequent statutes were admitted to be valid under any construction of them, " and therefore no construction placed by the state court on either of them, could draw in question its validity, as being repugnant to the Constitution of the United States, or any act of Congress." *Bridge Proprietors* v. *Hoboken Co.,* 1 Wall. 116, 144.

In *Lawler* v. *Walker,* 14 How. 149, where, in 1816, the legislature of Ohio had passed an " act to prohibit the issuing and circulation of unauthorized bank paper," and, in 1839, an act amendatory thereof, and the question arose whether or not a canal company, incorporated in 1837, was subject to these acts, it was held that the Supreme Court of Ohio, in deciding that it was, " only gave a construction to an act of Ohio, which neither of itself, nor by its application, involved in any way a

repugnancy to the Constitution of the United States, by impairing the obligation of a contract."

Whenever the power to enact a statute as it is by its terms, or is made to read by construction, is fairly open to denial and denied, the validity of such statute is drawn in question, but not otherwise.

In *Millingar* v. *Hartupee*, 6 Wall. 258, 261, 262, it was held that the word "authority" stands upon the same footing with "treaty" or "statute;" and said the court, through Chief Justice Chase:

"Something more than a bare assertion of such an authority seems essential to the jurisdiction of this court. The authority intended by the act is one having a real existence, derived from competent governmental power. If a different construction had been intended, Congress would doubtless have used fitting words. The act would have given jurisdiction in cases of decisions against claims of authority under the United States." "In many cases the question of the existence of an authority is so closely connected with the question of its validity that the court will not undertake to separate them, and in such cases the question of jurisdiction will not be considered apart from the question upon the merits, or except upon hearing in regular order. But where, as in this case, the single question is not of the validity but of the existence of an authority, and we are fully satisfied that there was, and could have been, no decision in the state court against any authority under the United States existing in fact, and that we have, therefore, no jurisdiction of the case brought here by writ of error, we can perceive no reason for retaining it upon the docket."

So in *Lewis* v. *Campau*, 3 Wall. 106, where the final judgment of the highest court of law and equity in the State of Michigan was that the revenue stamps attached to a deed offered in evidence and objected to as not having stamps proportioned to the value of the land conveyed, were sufficient, was held not a subject for review by this court under the 25th section of the Judiciary Act; and in *Mining Company* v. *Boggs*, 3 Wall. 304, 310, which was an action of ejectment

brought for the possession of certain mineral lands in California, where the defendant contended that he was in possession by virtue of an authority inferred from the general policy of the United States in relation to mines of gold and silver, Chief Justice Chase, speaking for the court, in dismissing the writ of error, said:

"The decision was, that no such license existed; and this was a finding by the court of a question of fact upon the submission of the whole case by the parties, rather than a judgment upon a question of law. It is the same case, in principle, as would be made by an allegation in defence to an action of ejectment, of a patent from the United States with an averment of its loss or destruction, and a finding by the jury that no such patent existed, and a consequent judgment for the defendant (plaintiff). Such a judgment would deny, not the validity, but the existence of the patent. And this court would have no jurisdiction to review it."

In *Gill* v. *Oliver's Executors*, 11 How. 529, under a treaty between the United States and Mexico a sum of money was awarded to be paid to the members of the Baltimore Mexican Company, and the proceeds of one of the shares of this company were claimed by two parties, and the judgment of the Court of Appeals of Maryland as to which of the claimants was entitled to the money was held not reviewable by this court. *Williams* v. *Oliver*, 12 How. 111.

The case at bar does not involve the exercise of an authority under the United States, in the sense of an authority to act for the government, but it is claimed that the railroad company acted under certain statutes of the United States authorizing such action, and that the validity of these statutes, or of authority under them, was denied.

But the Supreme Court of the District of Columbia did not deny the right of the defendant company to use its tracks in Washington on Maryland Avenue between Ninth and Tenth streets, in a lawful manner, for the purpose of transacting its lawful business; but, on the contrary, the jury was instructed that the plaintiff was not entitled to recover for any annoyances, discomforts, or inconveniences, which resulted from such

uses of Maryland Avenue by the railroad company "as were reasonably incident to the careful conduct of its through business, and to the maintenance and careful use of its freight depot or station abutting on the south side of said avenue between said Ninth and Tenth streets southwest," and the lawful uses to which the street might be put by the railroad company were clearly explained.

The jury were told that all stoppage of trains and shifting of cars necessary for carrying cars out of its freight depot over the different tracks for the purpose of making up freight trains were lawful. The right of the railroad company to establish freight stations or to lay as many tracks "as its president and board of directors might deem necessary." was not questioned. But the court also held that the company was not justified in occupying the public streets for the purposes of a freight yard as such, because the various statutes bearing upon the matter did not authorize such occupation, with which conclusion we are inclined to agree, though we forbear a determination of the point until presented in a case properly pending before us. The validity of the statutes and the validity of authority exercised under them, are, in this instance, one and the same thing; and "the validity of a statute," as these words are used in this act of Congress, refers to the power of Congress to pass the particular statute at all, and not to mere judicial construction as contradistinguished from a denial of the legislative power. In our opinion the validity of no act of Congress, or authority under the United States, was so drawn in question here as to give us jurisdiction, and therefore, as the amount of the judgment did not exceed five thousand dollars,

*The writ of error must be dismissed.*